UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Summer Michelle Rollins,                Civil File No.  14-cv-299 (SRN/HB)

                    Plaintiff,

v.                                       **PLAINTIFF'S MEMORANDUM
                                         OF LAW IN SUPPORT OF
City of Albert Lea, et al.               MOTION FOR PARTIAL
                    Defendants.          SUMMARY JUDGMENT**

---

## INTRODUCTION

Plaintiff Summer Michelle Rollins maintains claims under the Drivers' Privacy Protection Act, 18 U.S.C. § 2721, *et seq.* (the "DPPA.") against a handful of defendants in this case.  Based on deposition testimony garnered in discovery, it is undisputed that Defendants Howard Lake, its employee Ken Rollins, and Judy Hedin obtained and disclosed Plaintiff's personal information solely for personal reasons.  Both of the individual accessors are related to Plaintiff, estranged from her, and were simply curious and interested in learning where Plaintiff lived to share that information with her father, Dean Rollins.  Both individual defendants knew that Plaintiff was intentionally not sharing her address with her parents and ex-husband, and that is why they took it upon themselves to use the state database resource for their own purposes.  As such, Defendants Howard Lake, Ken Rollins, and Judy Hedin violated the DPPA and Plaintiff's rights and their liability is properly determined at this summary judgment phase.  This Court should also find that Defendants' willful  and reckless behavior

subjects them to punitive damages at trial.

## **FACTS**

### I.    **Plaintiff Summer Rollins**

Plaintiff is a 39-year-old single mother of twins.  (See S. Rollins Depo, Ex. A, at 7, 14-15).  Her parents, Defendant Hedin and Dean Rollins, divorced when she was a young girl; she lived with Defendant Hedin until approximately 16 years of age and then she lived with her father.  (Id. at 7-8).  After she moved in with her father, she did not have much interaction with Defendant Hedin or her extended family on either side.  (Id. at 22).  Of the extended family, she had the most contact with Defendant Ken Rollins, her father's brother.  (Id.).

Plaintiff has not had a good relationship with her mother, Defendant Hedin, for some time:

> Q:    In that time period, 2009-2010, what was your relationship like with your mother?
>
> A:    Non-existent.
>
> Q:     What do you mean by "non-existent"?
>
> A.    I didn't speak to her.
>
> Q:    Do you recall when you stopped speaking to her?
>
> A:    Pretty much, when I moved in with my dad.
>
> Q.    Okay.
>
> A:    I mean, we had a few attempts over the years, but they all failed so --

Q.:     And why did they fail?

A:     She has a tendency to use me as an easy target for all of her poor choices, I guess.

Q:     Can you tell me what you mean by that.

A:     She would always say, to me, that I was just like my dad. And her marriage failed, and she had some co-dependency issues, I guess. So, I guess, it was a constant reminder, because I looked like him, kind of act like him. You know, to make herself feel better about herself, she would just attack me.

(Id. at 12-13).

As an adult, Plaintiff was married to Phil Krause, but they were divorced in 2010. (Id. at 6). At that time, Plaintiff had full-time custody of her minor children; the custody terms changed over time, and as of January 2014, she and Phil Krause shared custody 50/50. (Id. at 15-17).

None of Plaintiff's family were particularly happy that Plaintiff got divorced: Defendant Hedin was disappointed and did not approve:[1] (Id. at 23, 26; see also J. Hedin Depo, Ex. B, at 95 ("…I was disappointed in the situation that was going with Summer and the kids and everything. And her and Phil…She knows divorce is hard on kids. I mean, she comes from a divorced family, you know.")).Plaintiff believes Defendant Hedin expressed this disproval in malicious ways:

Q:     …You mentioned your sisters and your mother also not approving of the divorce. So how did you know that? How did you know your mother didn't approve of it, if you weren't in touch with her?

---

[1] Defendant Hedin maintained a relationship with Phil Krause.

A:     Because she would -- she had sent the cops over to check on the welfare of the children, and there was a police report saying that I was living with undesirable people.[2]

(Id. at 23, 26; see also J. Hedin Depo, Ex. B, at 40, 44-45).

Defendant Rollins also did not approve of the divorce, and Plaintiff's relationship with her uncle deteriorated.  (Ex. A at 23, 26).  Plaintiff has not seen Defendant Rollins since her father's funeral in November 2013.  (Id. at 25).

Plaintiff has lived with her boyfriend, Bill McDonell, for a while.  (Id. at 20).  And for a while, her boyfriend's mother, Lucille McDonell, also lived with them.  (Id. at 20-21).

Plaintiff has never lived in Howard Lake and has never been there.  (Id. at 60).  Plaintiff was not even familiar with where Howard Lake was in 2012.  (Id. at 79).  Plaintiff did not know that Defendant Howard Lake had accessed her personal information prior to this lawsuit.  (Id. at 84).

## II.     Defendant Howard Lake's Direct Role In Obtaining DVS Access

Howard Lake entered into an agreement with DVS that allowed Howard Lake, as an entity, to be allowed access to the DVS Database.  (See Jacobson Depo,  Ex .F  at 76-77; see also e.g., DVS Business Partner Records Access Agreement, Ex. J,).  Under this agreement, government agencies like Howard Lake's Police Department are responsible for their own misuse.  (Ex. F at 78).  According to Jacobson, since at least 2007,

---

[2] Contrary to perceptions and/or statements by Defendant Hedin, (1) Plaintiff's boyfriend, Bill McDonnell, went through drug treatment four years ago and has been successful since then, and (2) although Plaintiff had used drugs as a younger woman, she stopped doing so when she was about 17 or 18 and is a reformed woman has not done so in the last ten years.  (Ex. A at 28-29).

government agencies must acknowledge their own responsibility and direct liability associated with using the DVS system:

> But every entity that wants access must complete this and each of their employees must complete their own agreement that says I've looked
> at the training, I understand what I can use it for, what I can't use it for and they sign it.

(Ex. Fat 82-83).   One of the specific terms relating to an agency's responsibility under the DVS agreement is that it will not use the DVS system for personal or non-business purposes.  (Id. at 86-88).

Consistent with Howard Lake's agreement with DVS, it allowed its employees to access the DVS Database to perform certain duties.  (See Howard Lake Answs. to Interogs, Ex.L, at 5).  Howard Lake further instructed its employees who had access to the DVS Database that accesses were to be made "for law enforcement purposes only and not to be used for personal gain."  (See id.).


## III.     Defendant Ken Rollins

### A.     Rollins' Familial Relationship to Plaintiff

Rollins is Plaintiff's paternal uncle.  (Id. 74-75).  His brother (Dean Rollins)—Plaintiff's father—was very close with Rollins.  (Id. at 80).  Dean Rollins died in November 2013.  (Id. at 75).  As a result of this familial relationship, Rollins knows Defendant Hedin—his brother's ex-wife.  (Id. at 77).

Rollins did not have a lot of interaction with his niece, Plaintiff, since she was a teenager.  (Id. at 81-82, 84).  Rollins  was disappointed when Plaintiff eventually got

divorced from her husband, Phil.  (Id. at 86).  After she was divorced from Phil, her

father never went to pick-up Plaintiff's children (his grandkids) at her house.  (Id. at 94).

Although Rollins hasn't interacted with Plaintiff since 2013 and his family

members have not interacted with Plaintiff's current significant other since before 2006,

Rollins disapproves of Plaintiff and her significant other.  (Id. at 87-88).

Rollins described Rollins as having been "estranged" from her immediate family

for quite some time, though he noted that all of his brother's daughters had been

estranged from their father at some point in time.  (Id. at 90, 102). He also described his

perception that Defendant Hedin and Plaintiff have not had "a decent relationship

probably for years." (Id. at 103).

### B.  Rollins' Experience as a Law Enforcement Officer

Defendant Ken Rollins ("Rollins") has been a law enforcement officer for

various cities in Minnesota since approximately 1984.  (K.Rollins Depo, Ex C, at 12-15).

More recently, he has been a part-time patrol officer for Defendant Howard Lake since

the end of 2012.  (Id. at 6-7).   As a patrol officer, his general duties have been to drive a

squad car, respond to calls, complaints or emergencies as requested by dispatch, respond

to traffic accidents, and conduct security checks at night.  (Id. at 15-16; 20-21).

Rollins has experience using Minnesota's DVS Database during his career as a

law enforcement officer.  The primary legitimate reasons for him using the DVS

Database have been to (i) run license plates to determine if a driver's license is valid,  (ii)

look up photos of license plates reported as gas drive-offs to show the photo to gas

attendant for identification purposes,[3] (iii) identify witnesses at a traffic accident, and (iv)
confirm identification of drivers or individuals at bars.  (Id. at 30-34).

Based on his experience working as a law enforcement officer he testified that
there are certain information and resources to which he has access that general members
of the public do not:

> Q:     Do you have access to resources that the common citizen doesn't have
>        access to?
>
> A:      What type of resources?
>
> Q:      Any of the law enforcement tools that you use.
>
> A:     Well, the computer in the car the general public doesn't have. The stuff
>        from dispatch.
> …
> Q:     Okay. So there's information that you're privy to as a law enforcement
>        officer that the average citizen is not?
>
> A:     Yes.

(Id. at 73-74).

Rollins further recanted a situation in which a woman called him claiming to be a
mother and wanting Rollins to tell her where her daughter lived, because she was afraid
she was suicidal.  (Id. at 62).  Rollins testified that he knew it was improper to disclose
that personal information regarding the daughter to the alleged mother.  (Id. at 62-64).  In
explaining that situation and part of the rationale for not disclosing the private
information, he stated that "I didn't tell the mother where she lived because if the girl

---

[3] Rollins acknowledged that he understood it was important that he protect other personal
information in the DVS system that might be visible to individuals to whom he was
showing DVS photos through his car window in these scenarios.  (Id. at 30-31; 53-54).

doesn't want her mother obviously to know where she lives, the address, then again that's
common sense type thing…"[4]  (Id. at 63).  Rollins testified that in this type of situation,
even where the caller's concern was for the welfare of the other person, it would
inappropriate for him to share the latter person's address with the former person:

Q:    So in that situation you didn't give her the address?

A:    No.

Q:    And you didn't think it was appropriate for you to give her the address?

A :   Right.

Q:    You did go do a welfare check yourself?

A:    Yes.

Q:     So you looked up the information with the assistance of your chief,
       correct?

A:    Yes.

Q:    And then you yourself went to go check on it, correct?

A:     On the girl.

Q:     On the girl, yes. Was it somebody in the Howard Lake jurisdiction?

A:    Yes.

Q:     Okay. What about if it had been somebody in a different jurisdiction,
             would you --

A:    I would say to contact the sheriff's office or whoever the appropriate agency
       is.

---

[4] Rollins also indicated that he was aware of data privacy laws that come into play, in
addition to common sense.  (Id. at 72).

(Id. at 66).  The only

Rollins had reported using the DVS database inappropriately to Plaintiff in the

past.  (Ex. A at 84).  He had told her that he would look up pretty girls in Mora.  (Id.).

**C.    Rollins Admits that He Accessed and Disclosed Plaintiff's Personal Information to His Brother For Non-Law Enforcement Reasons.**

DVS audit information reveals that Rollins used his Howard Lake credentials,

acting as Howard Lake, to access Plaintiff's personal information through the DVS

Database on March 3, 2013.  (See DPS Audit, Ex. D, at 2).   "CardData" access,

identified by Kim Jacobson ("Jacobson"), Data Practices Coordinator for DPS, as "photo

lookup[s], which includes basic demographic information."  (See March 2013 Email

Exchange between Potocnik and Kim Jacobson, Ex. KJ.

According to Rollins, the only reason he obtained and then additionally disclosed

Plaintiff's personal information from the DVS Database was because his brother, Dean,

asked him if he could find out where Plaintiff lives.  (Ex C at 117).  At some point, after

asking for Rollins' assistance, Plaintiff's father provided Rollins' license plate number to

Rollins so that he could use the DVS to look for her address.  (Id. at 118-119; 123-124).

And then he ran a search in the DVS  system to check Plaintiff's address and to try to

determine if it was the same or different than previous addresses in the system.  (Id. at

122-124).  Rollins did this in his capacity as a Howard Lakes police officer.  (Id. at 128).

Rollins could not remember at his deposition what the information he retrieved

confirmed to him at the time:

And like I said, I didn't care, I didn't care much about it. Because it's not like -- all I cared about was getting the information for my brother. As far as Summer and I, we didn't have a relationship and I could have cared less. I never would have ran it for me, you know, like I said, I didn't care where she is at and what she was doing, but he was concerned about his grandkids and their safety and where would we send law enforcement if she was gonna do something stupid again.

(Id. at 125).  He provided the information to his brother by phone, because he was his brother, and he would do him a favor if he asked.  (Id. at  137; 126-127).

He did recall offering to his brother that he could try checking Plaintiff's address again in the future for him.  (Id. at 127-128).  He believes his brother asked him to do so later as well and that he did.  (Id. at 133-134).

### D.      Rollins' Knowledge of This Lawsuit and Howard Lake's Response

Rollins first learned about his involvement in this lawsuit when he was notified by his chief:

…he pulled me aside and he goes, you were mentioned in a lawsuit involving the DVS thing, and he goes--- and I go, really, and he goes, yeah, and he goes, who is Summer, and I go Summer Rollins, that's my niece, and he goes, oh, I figured it probably had to be a relative, and that was basically it….

(Id. at 108).  When he was asked by his chief about his accesses of Plaintiff he stated:

…and I said, well, this is kind of ridiculous, I said, I was checking to see where she was at for my brother because he was concerned about his grandkids' safety, because I said, Summer has had problems and was suicidal.

(Id. at 111-112).  He further elaborated:

…I told him that -- that my brother had asked me if I could check and see where she was living and so that in the event that this happens he wanted to know where she was at so that we could contact the proper authorities to go check to make sure the grandkids were fine if she was suicidal.  He wanted to know where she was at because they hadn't been talking.

(Id. at 115).

And with this explanation, Rollins testified "that was pretty much it" and the chief "said it doesn't appear that there will be any disciplinary action taken." (Id. at 112). To the best of Rollins' knowledge, Howard Lake took no investigatory action. (Id. at 112-113).

## IV.    Defendant Judy Hedin

### A.    Defendant Hedin's Familial Relationship to Plaintiff

As indicated above, Defendant Hedin is Plaintiff's mother. (Ex. B at 20-21). Hedin is estranged from her siblings and is also estranged from Plaintiff (and has been since Plaintiff was a teenager).[5] (Id. at 19). Defendant Hedin also currently has a "strained relationship with her other daughter, Heather Coleman.[6] (Id. at 6). She has had similar issues with her third daughter in the past. (Id. at 24).

According to Defendant Hedin, she and Plaintiff have not talked to one another since 2012, and before that, 2009. (Id. at 26). The last time they were in each other's presence was at Dean Rollins' funeral in November 2013. (Id. at 25). The last time that Defendant interacted with Plaintiff's minor children was in approximately August 2014, at Plaintiff's invitation. (Id. at 28).

---

[5] According to Defendant Hedin, she believes the estrangement from Plaintiff stems from when she turned Plaintiff and her high school friends into the police for allegedly breaking into a cabin in 1994. (Id. at 29).

[6] Heather Coleman, an employee of Anoka County, was also a defendant in this lawsuit previously as another government employee who accessed Plaintiff's personal information from the DVS Database on more than one occasion. (See Complaint, Dkt. 1; see also Ex. 5).

### B.      Defendant Hedin's Job and Use of the DVS Database

Defendant Hedin worked for the Columbia Heights License Center from 2002 until approximately May 9, 2011 as a license clerk specialist  (Id. at 57-59).  She then began working in a similar job at the Coon Rapids License Center.  (Id.).  In her role as a license clerk specialist she would frequently access the DVS Database; she would do so to assist someone in renewing or replacing their driver's license and changing names or addresses on licenses.  (Id. at 61, 65).  She would answer drivers' questions about licenses.  (Id. at 63).  She would also assist people in obtaining hunting and fishing licenses, passports, birth certificates and death certificates, but those services did not require use of the DVS Database.  (Id. at 63-64).

### C.      Defendant Hedin's Accesses of Plaintiff's Information for Personal Reasons

In her roles as license clerk specialist, she never waited on Plaintiff.  (Id. at 60). Nevertheless, Defendant Hedin accessed Plaintiff's address information on the DVS system because she was "so worried and concerned about the safety of those grandchildren when they were in her care."[7]  (Id. at 66-67, 74).  Because Plaintiff did not tell her ex-husband where she was moving, Defendant Hedin used the DVS Database to see if she could find out:

---

[7] Defendant Hedin's stated reason for the concerns was based on what the grandchildren allegedly told her about their living conditions.  (Id.)  Defendant Hedin called social services, the Coon Rapids police department, and the children's school in August 2010 based on these comments; she requested a welfare check by the authorities, which was done by Coon Rapids police department, and which confirmed everything looked fine in the home.  (Id. at 68-70).

Q:    Okay. And how is it that checking her information in the DVS database addressed your concern about the children's welfare?

A:    Well, I knew she was moving and she wouldn't tell Phil where she was moving – give Phil the address where she was moving to, they always had to meet somewhere in between to trade out the kids. And Grandpa wanted to know in case he had to go get them if they called Grandpa and said, Grandpa, come get us. That's the only reason is because of the fear and safety for those kids.  That is the only reason.

Q:    So your husband –

A:    Well, my ex-husband. My ex-husband, Dean.

Q:    I'm sorry. Your ex-husband, Dean wanted to know what Summer Rollins's address was, correct?

A:    Well, we knew where she lived in Coon Rapids obviously, but you know, when she was moving to, where, Maplewood, you know, we had no clue where it was, just that it was Maplewood.

(Id. at 72).

It is undisputed that Defendant Hedin knew and believed that Plaintiff did not want her or Plaintiff's ex-husband to have her address; that is precisely why she resorted to using the DVS Database:

Q:    Okay. Was it your perception that Summer didn't want you to know where she lived?

A:    Well, she wouldn't even let Phil know where she lived at the time. I mean, I don't even know if he knows, I mean, to this day where she lives.

Q:    Okay. So let me ask my question; it was your understanding Summer didn't want you and Dean to know where she was moving to if she was, correct?

A:    She didn't want anybody to know.

Q:    But I'm talking about you.

A:    No.

Q:     She didn't want you to know?

A:      No.

Q:     And she didn't want Dean to know?

A:     No.

Q:     And to the best of your knowledge she didn't want Phil to know?

A:      As far as I know. You'd have to ask her.

Q:      Okay. That was your perception?

A:      Correct.

Q:      And because she didn't want you, Dean or Phil to know and didn't tell you, you went into the DVS database to see if you could find that out?

A:      Correct….

(Id. at 73-74).  To the best of Defendant Hedin's knowledge, she used the DVS Database to access Plaintiff's personal information 16 times from July through December 2003; four times in 2004; once in 2009; once in 2011; and twice in 2012.  (Id. at 76).

After accessing Plaintiff's personal information and confirming that her stated address had not changed, she relayed this information to her ex-husband, Dean.  (Id. at 75).  Defendant Hedin testified that she did not share this information with Phil Krause, Plaintiff's ex-husband.  (Id. at 75-76).

**D.     Defendant Hedin's 30-day Work Suspension Related to Unauthorized DVS Accesses.**

On or about July 1, 2013, Plaintiff lodged a complaint with Defendant Hedin's employer regarding her belief that Defendant Hedin was misusing the DVS

Database.  (See 7/1/13 email, Ex. G).  The Coon Rapids License Center initiated an

investigation that resulted in Defendant Hedin being suspended from her job for 30

working days without pay "for multiple unauthorized lookups of Department of Public

Safety- Driver and Vehicle Services (DVS) information on family members and

acquaintances."  (See 10/18/13 Letter from J. Lenarz to J. Hedin, Ex. H; see also Ex. B at

78-84).  As part of that suspension, Defendant Hedin was further required to sign a "Last

Chance Agreement."  (See Last Chance Agreement, Ex. I).


## LEGAL ARGUMENT

### I.        Summary Judgment Standard

Summary judgment is appropriate if the evidence demonstrates that there are no

genuine issues of material fact and that the moving party is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56; *Smutka v. City of Hutchinson,* 451 F.3d 522, 526 (8th

Cir. 2006).  A fact issue is material if its resolution impacts the case's outcome.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute is genuine when

the evidence could cause a reasonable jury to return a verdict for either party.  *See id.* at

252.

The moving party must demonstrate that there is sufficient admissible evidence to

show there are no genuine issues of material fact and that the movant is entitled to

judgment as a matter of law.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The

evidence must be viewed in the light most favorable to the nonmoving party.  *Mirax*

*Chem. Prods. Corp. v. First Interstate Commercial Corp.,* 950 F.2d 566, 569 (8th Cir.

1991).  After the movant has initially shown there are no genuine issues of material fact,

the nonmoving party must set forth substantial probative evidence that establishes a

genuine issue for trial.  *See Hartnagel v. Norman,* 953 F.2d 394, 395-96 (8th Cir. 1992).

The nonmoving party cannot simply rely on the allegations in its pleadings.  *Forrest v.*

*Kraft Foods, Inc.,* 285 F.3d 688, 691 (8th Cir. 2002).


## II.        The Governing Drivers Privacy Protection Act

There are three elements Plaintiff must establish to prove her DPPA claim against

each defendant:  (1) obtainment, use, or disclosure of personal information; (2) from a

motor vehicle record; and (3) for a purpose not permitted under the statute.  *Taylor v.*

*Acxion Corp.,* 612 F.3d 325, 335 (5th Cir. 2010).  "Personal information" is defined under

the DPPA as "information that identifies an individual, including an individual's

photograph, social security number, driver identification number, name, address (but not

the 5–digit zip code), telephone number, and medical or disability information." 18

U.S.C. § 2725(3) (2016).  Among that information, an individual's photograph or image,

social security number, and medical and disability information is considered "highly

restricted personal information."  Id. at § 2725(4).

"Persons" whose conduct is subject to the DPPA specifically includes individuals,

organizations, and entities.   Id. at § 2725(2).   The State and its agencies, however, are

excluded from the definition of "persons" under the DPPA.  Id.

To avoid liability, Defendants must have obtained or used Plaintiffs' personal data for a permitted purpose , that is, for or one of the enumerated in the DPPA.  *See* 18 U.S.C. § 2721(b)(1)- (14); *Maracich v. Spears,* 133 S.Ct. 2191, 2195 (2013) ("Disclosure of personal information *is prohibited unless for a purpose* permitted by an exception listed in 1 of 14 statutory exceptions) (emphasis added).  The specific exception at issue in this matter is the (b)(1) exception, which states that information may be obtained, used, or disclosed "[f]or use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions."  18 U.S.C. § 2721(b)(1).

III.   **Defendants Hedin, Rollins, and Howard lake Are Liable to Plaintiff Under the DPPA.**

   A.   **The Undisputed Facts Show that Defendants Accessed and Disclosed Plaintiff's Personal Information Purely for Personal Reasons and as a Result of Estranged Relations.**

As set forth above in detail, it is undisputed that Defendants Hedin and Rollins accessed Plaintiff's personal information because (i) Plaintiff was a member of the family with whom they had little to no contact; and (ii) Dean Rollins and/or Defendant Hedin had a personal interest in finding out where Plaintiff lived.  And although they were acting in their capacity as government employees, using access privileges and credentials obtained from their employers, there were no official business purposes for the accesses at issue as contemplated by 18 U.S.C. 2724(b)(1)..

As such, this Court can determine as a matter of law that Defendants Rollins, Hedin and Howard Lake violated the DPPA and Plaintiff has proved liability against these defendants. Damage amounts, however, are properly preserved for the province of the jury.

> **B.    Defendants Rollins and Howard Lake Violated the DPPA with Six Separate Accesses and Two Disclosures to Plaintiff's Father.**

This Court has already determined that accesses that are minutes or even seconds apart should be treated as separate accesses:

> "The Court notes that Defendants contend that "[a]ccesses within minutes of each other should be construed as one access." (See Defs. City of Albert Lea, et al.'s Reply at 5 [Doc. No. 69].)  The Court disagrees.  The DPPA provides a limited private right of action, authorizing suit against "a person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under" the statute. 18 U.S.C. § 2724(a).  According to *Nelson*, *Mallak*, and *Kampschroer* seeking or viewing information is sufficient for "obtaining" it under the DPPA. See *Nelson*, 2013WL 5888235, at *2; *Mallak*, 2014 WL 1285807, at *7; *Kampschroer*, 2014 WL 4988405 at *9. **Therefore, every time an official employed by Defendants viewed and accessed Rollins' private data, her information was "obtained."  Accordingly, Plaintiff has a DPPA claim based on each individual access, despite the fact that they occurred in close succession to one another."**

*Rollins v. City of Albert Lea*, No. 14-CV-299 SRN/HB, 2014 WL 7534658, at *24 (D. Minn. Dec. 17, 2014).  This Court amplified this point**:**

> ...According to the DPPA, a plaintiff has a cause of action against any person who knowingly obtains the plaintiff's personal information from his or her motor vehicle record, for a purpose not permitted under the DPPA. See 18 U.S.C. § 2724(a). Courts in this District have resoundingly held that every time an official views a plaintiff's private data, the official is liable for "obtaining" this private data. See Kampschroer, 2014 WL 4988405, at *9; Mallak, 2014 WL 1285807, at *7; Nelson, 2013 WL 5888235, at *2; (Cf. Defs. Sherburne and Washington Counties' Mem. at

12-13 [Doc. No. 75].) **Accordingly, every impermissible access of Plaintiff's private data, regardless of how close in time each access was, serves as a basis for Plaintiff's DPPA claims**."

*Id.* at *32 (emphasis added); see also Ex. C at 123 (different "clicks" within the system provide the system user with new and different information)).  And Kim Jacobson , the DPS employee who prepares and analyzes DVS audits, reports that "each line is a separate and single query."  (Ex. K at 1).

Accordingly, the record before the Court demonstrates the following DPPA violations by Defendants who are the subject of this motion:

|  | **Improper Obtainments:** | **Improper Disclosures:** |
|---|---|---|
| Hedin | 3 | 3 |
| Howard Lake/Rollins | 6 |  |
| Rollins |  | 2 |

(See Exs. D  and E; Ex. B at 75-76; Ex. C at 127).

## V.    Defendants Hedin, Rollins, and Howard Lake are subject to punitive damages.

Under the DPPA, there are several types of damages available to a person whose personal information has been improperly obtained, used or disclosed:

**(b) Remedies.**--The court may award--

**(1)** actual damages, but not less than liquidated damages in the amount of $2,500;

**(2)** punitive damages upon proof of willful or reckless disregard of the law;

**(3)** reasonable attorneys' fees and other litigation costs reasonably incurred; and

**(4)** such other preliminary and equitable relief as the court determines to be appropriate.

18 U.S.C. § 2724.

Although the amount of damages Plaintiff has suffered as a result of Defendants Hedin, Rollins, and Howard Lake is a question for the jury, this Court can determine that the undisputed material facts demonstrate willful and/or reckless disregard, allowing the jury to consider punitive damages as to each of these defendants.  Id.; *cf. Deicher v. City of Evansville*, 2007 WL 5323757 (W.D.Wis. 2007), *reversed on other grounds*.  This Court should so rule as a matter of law.


## CONCLUSION

Based on the foregoing, Plaintiff requests that this Court enter partial summary judgment in her favor, finding (i) Defendant Hedin liable for three improper accesses of Plaintiff's personal information and three improper disclosures of Plaintiff's personal information; and (ii) Defendants  Rollins and Howard Lark liable for six improper accesses and two improper disclosures by Defendant Rollins.


                                                    **SAPIENTIA LAW GROUP PLLC**

Dated:  May 9, 2016                                 s/ Sonia Miller-Van Oort
                                                    Jonathan A. Strauss (#0279602)
                                                    Lorenz F. Fett (#196769)
                                                    Sonia Miller-Van Oort (#278087)
                                                    Kenn H. Fukuda (#0389301)
                                                    12 South Sixth Street, Suite 1242
                                                    Minneapolis, MN  55402

(612) 756-7100, Fax: 612-756-7101
jons@sapientialaw.com larryf@sapientia
law.com
soniamv@sapientialaw.com
kennf@sapientialaw.com

**ATTORNEYS FOR PLAINTIFF**